1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANDREW CORTEZ CRATER,

11          Petitioner,                    No. CIV S-01-1893 MCE GGH P

12   vs.

13   GEORGE M. GALAZA, Warden,

14          Respondent.                    FINDINGS AND RECOMMENDATIONS
     _____/

15

16   *Introduction and Summary*

17          Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.

19          The instant petition was filed on September 7, 2001, and transferred to

20   Sacramento by order filed in this division on October 11, 2001.  The court appointed counsel for

21   petitioner on October 22, 2001.  An amended petition was filed on March 6, 2002.

22          Andrew Cortez Crater ("petitioner" herein) and Thomas Crater Robinson

23   (Robinson) set out to steal money by committing robberies in the Sacramento area on June 8,

24   1995 and June 9, 1995.  During this time, the pair encountered James Pantages, Robert Sidwell,

25   and Bill and Janet Smith.  Petitioner and Robinson robbed these individuals and Robinson fatally

26   \\\\\

1

shot Pantages.[1]  The evidence demonstrated that Pantages was not resisting, and was shot simply out of a senseless, despicable and complete lack of respect for life by petitioner's co-defendant.

Petitioner was convicted on April 23, 1997, and sentenced, with appropriate enhancements, on June 20, 1997, to life without the possibility of parole plus a consecutive term of 14 years and eight months for: one count of murder with special circumstances (Cal. Penal Code § 187(a)); five counts of second degree robbery (Cal. Penal Code § 211); and two counts of attempted robbery, second degree (Cal. Penal Code §§ 211, 664).

No issue exists concerning the evidence connecting petitioner to the robbery/murder.  Petitioner admitted his involvement; he even apologized to the victim's family pre-trial.  Petitioner raises three procedural issues which he believes denied him a fair trial:

1.  The trial court erred in failing to change venue;

2.  The trial judge exhibited bias on the facts of the case such that he should have recused himself;

3.  With respect to the robbery/murder special circumstance, the jury should have been instructed that the murder must have been committed to "carry out and advance" the commission of the underlying robbery.

For the reasons set forth herein, the petition should be denied as to claims 1 and 3; granted as to claim 2.

*AEDPA Standard of Review*

The AEDPA applies to this petition for habeas corpus, which was filed after the AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in

---

[1]  Before the fatal encounter with Pantages, Crater and Robinson committed one attempted robbery and one robbery.  During the attempted robbery, the victim struggled with Crater and Robinson, and then fled.  As he was fleeing, Crater or Robinson shot him through the leg.

1   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

2   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

3          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

4   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

5   for Section II of the opinion constitutes the majority opinion of the Court.  There is a dichotomy

6   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

7   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

8   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

9   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

10  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

11         "Unreasonable application" of established law, on the other hand, applies to

12  mixed questions of law and fact, that is, the application of law to fact where there are no factually

13  on point Supreme Court cases that mandate the result for the precise factual scenario at issue.

14  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

15  AEDPA standard of review that directs deference to be paid to state court decisions.  While the

16  deference is not blindly automatic, "the most important point is that an *unreasonable* application

17  of federal law is different from an incorrect application of law . . . .  [A] federal habeas court may

18  not issue the writ simply because that court concludes in its independent judgment that the

19  relevant state-court decision applied clearly established federal law erroneously or incorrectly.

20  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120

21  S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of

22  demonstrating the objectively unreasonable nature of the state court decision in light of

23  controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

24         The state courts need not have cited to federal authority, or even have indicated

25  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

26  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

1  contrary to, or an unreasonable application of, established Supreme Court authority. <u>Id</u>.  An

2  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

3  occurred. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

4  established Supreme Court authority reviewed must be a pronouncement on constitutional

5  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

6  binding only on federal courts. <u>Early</u>, 537 U.S. at 10, 123 S. Ct. at 366.

7      However, where the state courts have not addressed the constitutional issue in

8  dispute in any reasoned opinion, the federal court will independently review the record in

9  adjudication of that issue.  "Independent review of the record is not de novo review of the

10  constitutional issue, but rather, the only method by which we can determine whether a silent state

11  court decision is objectively unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.

12  2003).

13  *<u>Discussion</u>*

14      There is no need to recount all the facts of the crimes themselves.  The facts

15  necessary to adjudicate the issues are set forth below.

16      A.  <u>Change of Venue</u>

17          1.  *<u>Respondent's Waiver/Procedural Default  Assertion is Meritless</u>*

18      Respondent asserts that because petitioner did not renew the change of venue

19  motion during, or right after jury selection, the issue has been waived, i.e., procedurally

20  defaulted.  Whatever the merit of that assertion as a matter of state procedural law, the fact is, in

21  this case, the California courts did not procedurally default petitioner—all courts issuing an

22  explained decision reviewed the matter on the merits alone.  The *sine qua non* for a procedural

23  default ruling is a decision by the last state court issuing an explained decision on a basis

24  independent of federal law, e.g., a violation of state procedural law, which waives or denies the

25  claim.  Without an actual decision by the state courts on this state law basis, independent of the

26  federal issue, there can be no procedural default. <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 327,

1  105 S. Ct. 2633, 2638 (1985).   See also Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S. Ct. 2590

2  (1991).  Respondent cannot ask this court to issue such a ruling in the first instance in lieu of the

3  state courts.  Therefore, the undersigned turns to the merits.

4                    2. *No Evidentiary Hearing Will Be Ordered*

5            Arguing as if the AEDPA statute governing the holding of evidentiary hearings

6  did not exist, nor the Supreme Court precedent explaining petitioner's threshold burden which

7  must be met prior to the granting of an evidentiary hearing, petitioner demonstrates no reason

8  why the state evidentiary hearing on the venue issue was incomplete or otherwise unsatisfactory

9  in terms of evidence production.  Assuming that there exists some evidence today that petitioner

10 seeks to have this court entertain which was not introduced at the state court hearing, petitioner

11 demonstrates no reason why this evidence was not presented at the appropriate time in state

12 court.  Petitioner simply seeks to have this court rehear the evidence and testimony presented in

13 state court and make a de novo determination of the change of venue issue.  Petitioner is not

14 entitled to an evidentiary hearing for this purpose.

15          Generally:

16          To obtain an evidentiary hearing on an ineffective assistance of
           counsel claim, a habeas petitioner must establish that (1) his
17          allegations, if proven, would constitute a colorable claim, thereby
           entitling him to relief and (2) the state court trier of fact has not,
18          after a full and fair hearing, reliably found the relevant facts.

19 Correll v Stewart, 137 F.3d 1404, 1413 (9th Cir. 1998).  If, of course, petitioner's facts cannot

20 stand as the basis for a federal claim, e.g., the alleged error is not prejudicial as a matter of  law,

21 no evidentiary hearing is required.

22          Since the passage of AEDPA, a petitioner who has "failed to develop" a claim,

23 i.e., had an opportunity to develop a claim, but did not do so, is not entitled to an evidentiary

24 hearing unless that petitioner demonstrates diligence to discover the factual predicate for his

25 claim despite his "failure," and that he is actually innocent of the crime for which he was

26 convicted.  28 U.S.C. § 2254(e)(2); Williams (Michael) v. Taylor, 519 U.S. 420, 120 S. Ct. 1479

5

1  (2000).  A petitioner has not neglected his or her rights in state court if diligent in efforts to

2  search for evidence.  Williams, 529 U.S. at 435, 120 S. Ct. at 1490.  "Diligence ... depends upon

3  whether the prisoner made a reasonable attempt, in light of the information available at the time,

4  to investigate and pursue claims in state court."  Id.  "Diligence require[s] in the usual case that

5  the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by

6  state law."  Id. at 437; Bragg v. Galaza, 242 F.3d 1082, 1090 (9th Cir. 2001), as amended 252

7  F.3d 1150 (9th Cir. 2001).

8          Moreover, federal habeas law affords a presumption of correctness to facts found

9  after a full and fair hearing.  28 U.S.C. § 2254(e)(1).  A petitioner may overcome the

10  presumption with clear and convincing evidence, id., but it only makes sense to read the previous

11  general law on the granting of an evidentiary hearing in harmony with the presumption—unless

12  the petitioner alleges facts that would clearly warrant an overcoming of the presumption, there is

13  no need to hold an evidentiary hearing.

14          The record in this case demonstrates that petitioner had a full and fair hearing on

15  his change of venue motion, and in any event, petitioner does not demonstrate that he acted

16  diligently to present any "extra" evidence—whatever that extra evidence may be.  A

17  comprehensive motion to change venue was filed on behalf of both defendants, CT 223, 230-

18  248.  The motion was accompanied by four volumes of videotape news media coverage, a

19  community awareness survey prepared by a survey firm, and a 90 page document consisting of

20  computer generated reprints of news articles pertinent to the case.  CT 226.[2]  At hearing on the

21  motion (December 5, 1996), *both defense counsel indicated to the judge that they were ready to*

22  *submit the matter without further presentation.*  Petitioner's Exhibit Q at 2.  The trial judge

23  complimented counsel on their briefing.  Id.

24  \\\\\

25  _____

26      [2]  The exhibits save for the videotapes, which had been destroyed, were filed on
September 27, 2004.

6

1    Petitioner's counsel has yet to identify a single piece of evidence he would

2  propose to introduce in a federal evidentiary hearing, and the reason it was not presented to the

3  state court at the appropriate time.  Petitioner cites to a later request for continuance made by

4  petitioner's counsel, following the conviction of his severed co-defendant, to let things quiet

5  down prior to petitioner's trial.  Traverse at 13.  This is hardly being "denied the opportunity" to

6  present evidence at a hearing attempting to distinguish petitioner's venue case from that of his

7  co-defendant.

8    The undersigned finds that for whatever presently unknown evidence petitioner

9  would desire to introduce at a federal evidentiary hearing, he has not demonstrated the diligence

10 necessary to require the holding of such a hearing.  The court will not hold an evidentiary hearing

11 just to "do over" the hearing held before the state court.

12    3.  *The State Courts' Venue Decision Was Not AEDPA Unreasonable*

13    Understanding that in order for petitioner to prevail here, the decision of the state

14 courts on petitioner's change of venue motion must have been more than wrong, and even must

15 have been more than clear error, petitioner cannot meet this heavy burden.

16    To be sure, as the state Court of Appeal found, there was cause for concern as to

17 an inappropriate venue: "While the trial court emphasized that most of the [media] coverage

18 occurred only over a short period of time, we conclude there was a sufficient volume of publicity

19 to raise a healthy skepticism as to whether defendants could obtain a fair trial in Sacramento.

20 The nature of the coverage, however, was more benign than defendants were willing to accept."

21 Opinion at 12-13.  And, petitioner's counsel has done his usual good job in marshaling and

22 presenting his case herein, i.e., the media reports which illustrate the reason for the concern.

23    Petitioner points to several front page or otherwise significantly placed articles in

24 the Sacramento Bee.  While the victim, Pantages, was not a super-star, his known presence in the

25 community evoked special press reaction given the senselessness of his murder.  Pantages was a

26 news director for a local TV channel and also played trumpet in various local bands.

Furthermore, petitioner, a one-time outstanding student as well as aspiring doctor, and one who

was caring for his family, was seemingly on the road to success and contribution to society,

making his participation in the robbery/murder all the more newsworthy.  Again, the Court of

Appeal fairly and comprehensively summarized the evidence of pre-trial publicity:

> Local press coverage of the murder and robberies was extensive, including front
> page stories and pictures, feature articles, editorials, letters to the editor, and in-
> depth analyses.  Descriptive language colored the stories with references to the
> "senseless" shooting, "extremely cold blooded, unprovoked" murder, "pistol
> whipped" and "natural born killer[s]."  Five hundred fliers were distributed in
> downtown Sacramento before defendants were arrested.  Moreover, the press
> covered Pantages's funeral service as well as a benefit concert held in his
> memory.
>
> When defendants were arrested, they were characterized as "urban predators."
> Crater's jailhouse confession was broadcast and the Sacramento Bee printed
> excerpts from a letter Crater wrote from jail to the Pantages family[3].
>
> Television coverage of the crimes and ensuing investigation, arrests, an [sic] court
> proceedings fill nearly four videotapes.  While coverage ebbed and flowed during
> the 22 months from the commission of the crimes until Robinson's trial, there was
> a steady stream of information delivered to the media-consuming public.  A
> community awareness survey conducted 17 months after the murder, reflected that
> nearly 61 percent of the registered voters in the county were aware of the case, and
> 41 percent believed defendants had committed the crime.

Opinion at 12.

In denying petitioner's motion, the trial court made the following findings and

determinations: (1) the most current population estimate in Sacramento County was 1,126,800;

(2) Sixty-nine percent of the county's population was Caucasian, while only nine percent of the

population was African American; (3) The estimated size of the jury pool was 855,935 people;

(4) "The extensive media coverage [in this case] does not appear to approach that of the cases in

which venue has been transferred from Sacramento County.  This factor [weighs] against the

---

[3]  A portion of the letter was described in the Sacramento Bee: "In a 119-word printed
letter to Pantages' family, Crater said ''me and my partner approached James'' and ''a terrible
crime was committed.'' He said ''I am not the one to pull the trigger'' and claimed he ''didn't
have any idea that it would happen.'' He accepted blame, said, he's ''had loved ones taken from
me'' and that he knew the family's ''pain.'' ''However,'' he wrote, ''it has already happened.  I
had no idea.  I'm sorry.  I just want you to know I feel horrible.'' Petitioner's Exhibit J.

transfer of venue[;]" (4) "[N]either the nature nor the extent of publicity in the defendant[s'] case favors a change of venue[;]" (5) "While voluminous, the video that I viewed seemed to be concentrated over a short period of a few days[:]" (6) the newspaper reporting concerning the case was not "unique . . . inflammatory or particularly sensational.  Newspaper, radio, and television coverage has not been extensive or prejudicial.  Much of it, I found, to be repetitive, and the biggest portion of it was seeking information about the case from the viewing public in an effort to apprehend those responsible . . . . Media coverage contained very little information [that] would be admissible against the defendants[;]" (7) the survey that Robinson's counsel commissioned "demonstrates that publicity does not fix this case in the minds of potential jurors in the community, [and] that there would be literally thousands in this County that know virtually nothing about the case with no preconceived opinion about guilt or innocence . . . the significant, major portion of the publicity, took place at and near the time of the alleged crime, seventeen months ago, and to some lesser extent a few months later at the preliminary examination . . . . Neither defendant can be characterized, I believe as an 'outsider'[:]" (8) "Murder victim Jim Pantages was loved and respected by all who knew him.  That was evident in the video and news article.  As a part-time musician in a local band he was not widely known but had a loyal following and brought joy with his music and personality.  His death may have been more highly publicized because of his job as a news director for KOVR TV.  However, that alone is not sufficient to [compel] a change of venue."  Based on these findings, the court denied petitioner's motion for a change of venue.

On January 27, 1997, the case was assigned to Judge Richard K. Park for trial.  After this trial assignment, Robinson and Crater's motion to sever their cases was granted.  The court ordered Robinson's case to proceed first.  Robinson was convicted on all counts.  But during the penalty phase, the jury was unable to unanimously agree to impose the death penalty or life without parole.  In March of 1997, a mistrial was declared as to the penalty phase.  The state declined to retry the penalty phase.

On April 7, 1997, petitioner's counsel sought to have the case reassigned under California Code of Civil Procedure § 170.6. Judge Park denied the request as untimely and asserted that he could be fair and impartial. That same day, petitioner also renewed his request for a change of venue. Alternatively, he sought a continuance to allow the publicity from Robinson's recent trial and conviction to subside. The court provisionally denied these requests, opting to conduct voir dire and allow Crater to renew his requests if warranted. The court agreed to treat Crater's requests as continuing ones. However, as observed above, petitioner's trial counsel made no further change of venue requests.

Of the 70 prospective jurors in Robinson's trial who got past hardship screening and death-qualification, 35 had heard about the case. Thus, 50 percent acknowledged having heard about the case. Out of the 39 prospective jurors in Crater's trial who were questioned on the record concerning their exposure to publicity concerning the case, petitioner alleges only one had not been exposed to media coverage. The undersigned is not so sure about this number because the jurors gave indication of exposure to prior media coverage on questionnaires not available to the undersigned, and not everyone of the 39 was questioned about pretrial publicity. However, suffice it to say that the vast majority of the potential jurors in petitioner's case were exposed to some publicity about the robbery/murder. Nevertheless, the *quantity and quality* of that exposure was slight to very, very slight for the majority of potential jurors. A fair characterization of all those responses can be found in the following responses:

> The Court: Now, you have seen some publicity about this case both in the Bee and on TV, right?
>
> Prospective Juror Sullivan: That's correct.
>
> The Court: Do you feel that you have learned anything more about this case than I may have described to you yesterday or today, or what you may have read in this questionnaire?
>
> Prospective Juror Sullivan: No, I do not.

10

1   RT 86.

2   The court, with the stipulation of the parties, had previously informed all potential jurors :

> But I've also been authorized to be very candid with you folks about just what the
> issues are going to be in this case.  And there will be no dispute in this case that
> Mr. Pantages was killed with a handgun on June 9th, 1995, on the K Street Mall.
> There will be no dispute that Mr. Thomas Robinson, previously convicted of that
> crime, is the one who did the shooting.

> There will be no dispute that Andrew Crater, the defendant here, was present
> during that shooting.  And there will be no dispute that he was present during some of the other crimes tha

> The question this jury is going to decide, a very different question than was
> involved in the case of Mr. Robinson, is why was he there?  What was he doing
> there?  What was going through his mind?  Did he have the intent to aid and abet
> the crimes that Mr. Robinson was committing and has been convicted for?

RT 56-57.  [So all jurors knew something about the case, including petitioner's presence at the

scene of the crime from the stipulation of counsel].

> The Court: Now, you saw some and read some publicity about this case, right?

> Prospective Juror Kido: Right.

> The Court: Do you feel that that has biased you or prejudiced you in any way in

> this, the trial of Mr. Crater?

> Prospective Juror Kido: No.  You know, I think it's kind of bits and pieces, but I

> haven't  really followed it that close.  I don't think so.

RT 96-97.

> The Court: All right.  You've seen some publicity about this case?

> Prospective Juror Freitas: Very little about it, just what I saw on TV when he was

> killed.

RT 106

> The Court: You indicate that you saw something on TV, but your knowledge of

> this case is even less than what we described for you on the first page [of the

> questionnaire]?

1  Prospective Juror Neilson:  When they start hitting the news all the time, I tend to

2  ignore it most because I get tired of listening to it.

3  RT 108.

4  Ms. Gutowsky: Could you tell me what you know about Andrew Crater's mental

5  state based on anything that you may have read or seen on TV?

6  Juror Number Eight: I can't, I haven't seen anything.  I don't know anything about

7  this.  I don't know this gentleman at all.  I figure at the time that crime happened, I

8  was in Missouri...

9  RT 121.

10  The Court: And apparently you haven't heard or read anything about this case in

11  the news?

12  Juror Number Nine: No.  The only– I don't subscribe to any papers, and if I do, it's

13  at a newsstand or whatever, and I just look at sports....

14  RT 126.

15  The Court: A couple questions for you.  You've seen the media coverage of this

16  case, right?

17  Prospective Juror Clark: Actually heard it on the radio.

18  The Court: Do you feel that will influence you in weighing the trial of this case?

19  Prospective Juror Clark: No, it was very brief.  Just that something had happened

20  in the last week or two, I wasn't even sure what it was that had occurred.  Didn't

21  really remember much other than the fact someone was killed on the K Street Mall,

22  and something was going on with the trial.

23  RT 128-129.

24  The Court: You haven't heard anything about this case in the news?

25  Prospective Juror Christensen: Yes, I have heard about it earlier on more than the

26  recent one.  The recent one, I heard something as happening, but I didn't pay

1  attention to it.  But a couple years ago I heard it on television.

2 RT 138.

3       The Court: Do you recall this case being reported in the Bee?

4       Prospective Juror Jones: I do.

5       The Court: Do you remember anything more than what you read in this

6  questionnaire?

7       Prospective Juror Jones:  No.

8 RT 177.

9       Petitioner contends that the facts of his case meet the presumed prejudice standard

10 of Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S. Ct. 1507, because he has shown a "reasonable

11 likelihood that prejudicial news prior to trial ... prevent[ed] a fair trial."  He also claims that "the

12 record demonstrates that the community where the trial was held was saturated with prejudicial

13 and inflammatory media publicity about the crime."  Harris v. Pulley, 885 F.2d 1354, 1361.

14       A trial court's denial of a defendant's motion for a change of venue does not, in

15 itself, violate the Constitution.  Rather, the trial judge's refusal to change venue rises to the level

16 of a constitutional violation only if it resulted in prejudice so great as to deny Crater his right to a

17 fair trial.  Id. (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639 (1961) (superseded on

18 other grounds by statute)) ("The standards governing a change of venue ultimately derive from the

19 due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment

20 right to be tried by 'panel of impartial, indifferent jurors.'").  In order to show a violation of his

21 constitutional rights based on the trial court's denial of his venue motion, petitioner must show

22 either actual or presumed prejudice.  Randolph v. People, 380 F.3d 1133, 1142 (9th Cir. 2004).

23       Prejudice is presumed when the record demonstrates that the community where the

24 trial is held is "'saturated with prejudicial and inflammatory media publicity about the crime.'"

25 United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  In Rideau v. Louisiana, 373 U.S.

26 723, 83 S. Ct. 1417 (1963), the Supreme Court found that the denial of a motion for change of

13

1   venue violated due process when a confession made by the defendant was videotaped and

2   broadcast three times by a local television station.  Because three members of the jury who

3   ultimately convicted the defendant viewed the tape, the Court found the media publicity to be

4   sufficiently extreme to invoke the presumed prejudice rule.  Unless the publicity renders the trial a

5   "hollow formality," id. at 726, however, the presumed prejudice rule is rarely applicable.

6            Actual prejudice exists if the jurors demonstrate actual or partial hostility that

7   cannot be laid aside.  Sherwood, 98 F.3d at 410.  "Jurors need not, however, be totally ignorant of

8   the facts and issues involved."  Murphy v. Florida, 421 U.S. 794, 800, 95 S. Ct. 2031, 2036

9   (1975).  Actual prejudice is not demonstrated by merely showing juror exposure to pretrial

10  publicity.  "The relevant question is not whether the community remembered the case, but

11  whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of

12  the defendant."  Patton v. Yount, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 2891 (1984).  The

13  Supreme Court has held that a key factor in gauging the reliability of juror assurances of

14  impartiality is the percentage of veniremen who "will admit to disqualifying prejudice."  Murphy,

15  421 U.S. at 803, 95 S. Ct. at 2037.  The higher the percentage of veniremen admitting to a

16  previously formed opinion on the case, the greater the concern over the reliability of the voir dire

17  responses from the remaining potential jurors.

18            Because petitioner cannot and does not claim actual prejudice, he must show

19  presumed prejudice to succeed on this claim.  In evaluating a claim of presumed prejudice, the

20  court considers three factors: (1) whether there was a "barrage of inflammatory publicity

21  immediately prior to trial amounting to a huge" wave of public passion; (2) whether media

22  accounts were primarily factual or editorial in nature; and (3) whether the media accounts

23  "contained inflammatory, prejudicial information that was not admissible at trial."  Ainsworth v.

24  Calderon, 138 F.3d 787, 795 (9th Cir. 1998).

25  \\\\\

26  \\\\\

14

The state Court of Appeal found:

The trial court was confronted with a difficult decision. Having carefully considered each of the factors enunciated by the Supreme Court to guide our assessment of the necessity for a change of venue, we acknowledge the issue is close. The size of Sacramento County as a large metropolitan area strongly suggests fair and impartial jurors could be found. While the publicity was pervasive, we have concluded it was not unduly sensational or inflammatory. A capital murder, by definition, is newsworthy and the consequences of a trial are indeed grave because another life is at stake. Nevertheless, the public was not inundated with gruesome facts as is often prevalent in horrible crimes. The murder was admittedly senseless. We do not find, however, that the coverage was any more sensational than the very nature of the crime itself would require.

While we accept defendants' contentions that Pantages was prominent within Sacramento and his prominence escalated after his death, we do not find that his prominence was so great as to seep into the consciousness of the entire community venire. Many people knew and loved James Pantages. But Sacramento has over 1.2 million registered voters. We do not believe it was reasonably likely that his notoriety was great enough to infect the partiality of most of those potential jurors. Crater's status as a UCD student did not further compromise his ability to secure a fair trial, whereas Robinson, as a parolee from Oakland, was at much greater risk of a biased pool.

In conclusion, we accept the trial court's finding that the factors are slightly tipped against a change of venue. An analysis of Supreme Court precedent bolsters our conclusion. The Court has said repeatedly that the size of the community alone is not determinative. Yet, in all the cases the Court reversed a trial court's denial of a change of venue, the communities in which the crimes occurred were indeed small. By contrast, the Court has affirmed the trial court's denial of motions for a change of venue in large counties.

*People v. Harris, supra,* 28 Cal. 3d 935, is on point. As in the case presently before us, the Supreme Court found a balancing of factors in *Harris* relatively close. The press coverage was extraordinarily graphic and pervasive. Almost any conscious person in Southern California had heard of the brutal kidnapping and murder of two teenage boys in San Diego. Of particular notoriety was defendant's callous behavior following the shooting by finishing the victims' partially eaten McDonald's hamburgers. Consequently, the gravity of the crime and the pervasiveness of the sensational reporting weighed in favor of a change of venue. The status of the victims and the accused, a local resident, were neutral factors. "The final factor – the size of the community – tipped the balance against venue change."

As in *Harris*, the size of Sacramento tips the balance against a venue change. Although the press coverage of the killing of a popular young musician and news director was comprehensive, we do not find that bias was imbedded into the public consciousness. Sacramento County is large enough to dissipate the adverse effects of pretrial publicity if a jury is carefully chosen. We turn then to the actual voir dire of the juries to determine whether there is a reasonable likelihood defendants actually received a fair trial. A reviewing court looks for "any indication from the

voir dire of prospective and actual jurors that the publicity did in fact have a prejudicial effect."

* * *

In Crater's trial 43 out of the 49-person venire had heard about the case.  Of the original 12 jurors impaneled to hear the case, 8 acknowledged they had been exposed to pretrial publicity.  One of the jurors explained that her daughter, a friend of Pantages, had been very upset when he died and had attended the funeral . . . .  We have completed the analysis compelled by our understanding of precedent.  Having evaluated each of the factors relevant to a review of the denial of a motion for a change of venue, we conclude the size of Sacramento County tipped the balance against a change of venue.  There is nothing in the actual voir dire examination of the jury venire, including the voir dire of the jurors who were actually seated, to suggest any one of the jurors harbored a bias against the defendants predisposing him or her to convict.  Moreover, the court admonished the jurors several times throughout the trial not to read or listen to news accounts about the trial thereby minimizing the risk of further publicity affecting the jurors.

The undersigned cannot say that the state court's lengthy and well thought out determination was an unreasonable application of clearly established law. The level of prejudicial publicity warranting a change of venue in the cases cited by petitioner is far greater than that petitioner presented before the state courts.  Compare, e.g., Irvin v. Dowd, supra (actual prejudice rendered fair trial impossible where barrage of inflammatory publicity immediately before trial included information on defendant's prior convictions, his confession to burglaries and murders including the one for which he was tried, an unaccepted offer to plead guilty, and eight of twelve jurors had formed opinion defendant was guilty before trial began); Rideau v. Louisiana, supra, (prejudice presumed where defendant confessed under police interrogation to the murder and 20 minute film of confession was aired three times); Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507 (1966).  Discussing these same cases, the United States Supreme Court stated: "The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob.  They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." Murphy, 421 U.S. at 799, 95 S. Ct. 2031.

16

1        One point the undersigned has been particularly sensitive to is the fact that

2 petitioner's confession and apology to the victim's family was set out in the media publications

3 and broadcasts.  A confession is often the single most powerful piece of evidence in a criminal

4 trial, see Tennessee v. Street, 471 U.S. 409, 415, 105 S. Ct. 2078, 2082 (1985).  Nevertheless, in

5 the Irvin and Rideau cases cited above, the police and the prosecutors were responsible for

6 orchestrating the media blitz surrounding the confessions.  Here, the defendant on his own granted

7 an interview with the media for more or less of a conscience clearing purpose.  Publicity about a

8 confession should not weigh very heavily when a defendant, acting for his own purposes,

9 purposefully creates the very publicity he later decries in the criminal proceedings.

10       In support of the AEDPA correctness of the Court of Appeal's decision, the

11 undersigned relies heavily on his review of the responses of petitioner's venire when questioned

12 about their exposure to publicity.  The effect of the publicity was extremely mild to non-existent

13 in terms of the vast majority of jurors questioned.  In light of those nearly universal responses, the

14 closeness of the case dissipates quite a bit.

15       Also, the undersigned cannot help to observe that petitioner's defense, a very

16 limited state of mind defense, would not have been much impacted by pretrial publicity.

17 Whatever the level of publicity, and even if there had been none, petitioner had confessed to

18 participating in the crimes.  He was going to put on the defense he did whether or not there was

19 extensive publicity.  In that light, pretrial publicity most affects those cases where the defendant

20 will argue an alibi defense, or perhaps self-defense, but the "facts" in the pretrial publicity make

21 such defenses subject to being pre-judged.  In this case, petitioner's state of mind for the crime,

22 presented as much as an insolvable puzzle in several media reports as anything else, was not near

23 subject to the same prejudging as alibi and other affirmative defenses.  Thus, the impact of the

24 publicity in this case would be significantly lessened.

25       Finally, insofar as petitioner's trial was held after that of his co-defendant, the court

26 again observes that the alleged prejudice occasioned by the extensiveness of the publicizing of the

first verdict was belied by the nearly universal ignorance of any significant fact recollected by petitioner's venire. And, of course, petitioner's defense related to his own state of mind, which would not have been impacted very much, if at all, by recollections about petitioner's co-defendant.

Accordingly, petitioner's claim based on a failure to change venue should be denied.

4. *The Trial Court's Statements During Participation in Plea Bargaining Warrants Relief*[4]

"A neutral judge is one of the most basic due process protections." <u>Castro-Cortez v. INS</u>, 239 F.3d 1037, 1049 (9th Cir.2001). The state courts' policy of permitting the trial judge to participate in plea bargaining is fraught with peril, because of the great potential that the trial judge's urging of a certain plea bargain will make him look less than impartial. This case presents that issue foursquare.

On April 3, 1997, Crater, Judge Park, Crater's trial attorney, and the prosecutor met in Park's chambers. During the meeting, Judge Park learned that the state had made an offer to Crater, which called for Crater to plead guilty to first degree murder in exchange for the state's agreement to dismiss the special circumstance allegation. During this meeting, Judge Park sought to convince Crater to accept the State's offer.

> Based upon what I know about this case – and I'm in a very unique position in this case, because I've already heard all of the witnesses. I know everything that happened that night, and I have assessed everything that the witnesses have said....and based upon what I've heard about this case, I'm real sure that you're going to be convicted of all of those robberies...and you're going to be found guilty of murder in the first degree.

RT 31-32.

---

[4] Without arguing procedural default at all, respondent makes a three line statement that perhaps petitioner waived the issue of bias. Such a statement, without briefing, cannot constitute an assertion of procedural default. In any event, even if the "automatic" § 170.6 challenge was untimely, the trial judge went ahead and analyzed it as if a § 170.1 "cause" challenge had been made.

He characterized the state's offer as a "major concession" and further told petitioner:  "A jury is not going to like you, RT 33 . . . . [Y]ou're going to be found guilty of everything that the offer being extended [to] you asks you to plead to . . . ." RT 33.  The judge explained the felony murder rule, and accomplice liability, and said: "That's why you're going to be found guilty of first degree murder."  RT 32.  The judge told petitioner that the only issue at trial was concerned with the special circumstance allegation, which required a type of "recklessness": "The risk you run is that the jury will find you guilty of the special circumstance, will find that you acted recklessly that night, and in my opinion, based upon everything I've heard, that is a monumental risk for you." RT 33.  See also RT 33: "You might beat the special circumstances; I don't think you will."

> So then you may be asking yourself, well, what kind of sentence would I get?  And I, as the judge, am supposed to keep an open mind about what sentence to impose.  But as I said, I already know a great deal about this case, a lot more than a judge would if you were the only defendant and hadn't heard the Robinson case.
>
> So I have some pretty good notions about went onwhat  that night.  This much I can tell you, I would have no discretion whatsoever on first degree murder, none.  You would get twenty-five years to life.  That's what the law says.  I can't do anything less, I can't do anything more.
>
> I can tell you that most judges looking at what happened that night would probably be inclined to impose consecutive penalties for each of the other robberies, and uses of the gun....

RT 33-34.

The judge continued to jawbone petitioner quite a bit, telling him at one point that going to trial was a "stupid" decision.  Despite these remarks, and apparently because petitioner knew all too well that he would be very old when released on parole, if at all, petitioner elected to proceed to trial.

Several days later, petitioner's counsel moved to recuse the judge.  The judge first held that the motion to recuse based on Cal. Code Civ.P. § 170.6 (automatic recusal) was untimely, but he also related, as if a challenge for cause had been made (§ 170.1), that he believed he could be fair, and would recuse himself if he believed otherwise.

> I did sit through all the testimony, obviously, of the co-defendant, Robinson;

1    therefore, I have a pretty fair notion of what happened that night with respect to
     Robinson. And I heard testimony about Mr. Crater being present at most of those
2    events.

3    But what I have not heard is essentially your defense in this case. What was Mr.
     Crater doing there? Why was he there? What was going through his mind? Did
4    you have any mental state consistent with aiding and abetting Robinson?

5                                              ***

6    And therefore, although I know something about the facts and circumstances of
     this case, that's what I would have learned just almost by a pretrial discussion with
7    the lawyers.

8    In terms of the defense of this case, I have no preconceived notions about how it is,
     so I will assure all of you, you will have this case tried fair and square.
9

10   RT 46-47.

11          In finding that the trial judge had not exhibited judicial bias, i.e., prejudgment of

12   the facts, the Court of Appeal focused upon the judge's good intentions in attempting to have

13   petitioner get a better outcome than the jury and sentencing judge (the same judge) would give

14   him, and the trial judge's neutral comments at the motion to recuse. The Court of Appeal found

15   that the trial judge had "attempted to paint the worst case scenarios to assist Crater in making an

16   informed decision as to whether to accept the prosecution's offer." "Simply put, the law does not

17   compel disqualification for presumed judicial bias and the facts do not support a finding of actual

18   bias." Opinion at 30.

19          In a very recent case, the Seventh Circuit has accurately described the judicial bias

20   law applicable in the AEDPA context:

21   We conclude that the *Rochelt* analysis is contrary to clearly established federal law
     for two reasons. First, as Judge Evans of this court observed in his opinion for two
22   different majorities of this court in *Bracy v. Schomig*, 286 F.3d at 410-11, the
     Supreme Court has decided that both actual bias and the appearance of bias violate
23   due process principles. See *Bracy*, 520 U.S. at 905, 117 S.Ct. 1793 (actual bias);
     *Tumey*, 273 U.S. at 535, 47 S.Ct. 437 (actual pecuniary interest and thus actual
24   bias); *Aetna Life Ins. Co.*, 475 U.S. at 825, 106 S.Ct. 1580 ("The Due Process
     Clause 'may sometimes bar trial by judges who have no actual bias and who would
25   do their very best to weigh the scales of justice equally between contending
     parties.'") (citing *In re Murchison,* 349 U.S. at 136, 75 S.Ct. 623). Second, where
26   there is a structural error, such as judicial bias, harmless error analysis is irrelevant.

                                               20

1    See *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S.Ct. 1584, 137 L.Ed.2d 906
2    (1997); *Bracy*, 286 F.3d at 414; *Cartalino v. Washington*, 122 F.3d 8, 9-10 (7th
     Cir.1997).

3    Franklin v. McCaughtry,  398 F.3d 955, 960-961 (7th Cir. 2005).

4    Jones v. Luebbers, 359 F.3d 1005, 1012 (8th Cir. 2004) ("[C]learly established Federal law, as

5    determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1), recognizes not

6    only actual bias, but also the appearance of bias, as grounds for disqualification.")

7    In Franklin, the trial judge denied bail pending appeal in another, unrelated case

8    (Taylor).  When Taylor appealed, the judge filed a memorandum in support of his decision

9    because the judge believed a Wisconsin state supreme court decision seemingly at odds with his

10   decision had been wrongly decided.  As support for his argument, the judge emphasized the facts

11   in Franklin which involved a defendant who had been released on bail, but who (allegedly) during

12   that period, committed robbery in which he stabbed two persons.  A newspaper picked up on the

13   issue and referenced the Franklin facts the judge had "found."  Franklin later proceeded to trial

14   before the same judge.  The Seventh Circuit determined: "Here, the only inference that can be

15   drawn from the facts of record is that Judge Schroeder decided that Franklin was guilty before he

16   conducted Franklin's trial.  This is a clear violation of Franklin's due process rights."  Franklin,

17   398 F.3d at 962.  It is not possible to interpret Judge Park's pre-trial comments herein to

18   petitioner/defendant in any other manner.

19   The undersigned does not believe that respondent's cited case of Liteky v. United

20   States, 510 U.S. 540, 114 S. Ct. 1147 (1994) controls.  If what was at issue here was simply a

21   necessary ruling of a trial judge, which nevertheless impacted the ultimate viability of petitioner's

22   case at trial, no bias is shown even if the ruling will greatly affect a later trial.  It is well settled

23   that the mere fact that a judge presided over a co-defendant's separate trial does not constitute

24   reasonable grounds for questioning the judge's impartiality or otherwise amount to a due process

25   violation.  Liteky, 510 U.S. at 554 (1994); Paradis v. Arave, 20 F.3d 950, 958 (9th Cir.1994)

26   (citation omitted).  No due process violation would be found here simply because the trial judge

had been exposed to facts which indicated petitioner's guilt.  Moreover, the court is well aware that trial judges in criminal cases often have exposure to, and make findings upon, the facts of the case before trial; judges issue probable cause findings in terms of arrest warrants or preliminary examinations, or suppression motions, and such findings on the facts do not constitute grounds for recusal of the finding judge from later participation as the trial judge.  Withrow v. Larkin, 421 U.S. 35, 56, 95 S. Ct. 1456, 1469 (1975).  However, such findings are not accompanied with statements that the defendant will undoubtedly be found guilty at trial.

The undersigned will not simply repeat the statements of the trial judge quoted above.  They speak for themselves.  The statements were unequivocal expressions that the judge thought the defendant guilty.  And, the court cannot help but notice the complete change in tone from the judge's unequivocal "you will be found guilty" to his later statement that he had "no preconceived notions" about his guilt.  It is much more likely that the judge believed what he initially told the defendant—you will be convicted on all charges.  Nor is the undersigned naive with respect to the good intentions of the judge at settlement hearing, or that a good settlement judge will often push the parties hard with strong opinions.[5]  The point here is that in criminal trials the trial judge should not be pushing such opinions in plea bargaining sessions, and then be compelled to later completely discount them when acting as the trial judge.  Neither is this the situation where the settlement/trial judge was presuming facts given to him by lawyers—the judge acquired his facts from the previous trial of the co-defendant, and he told petitioner, "I know everything that happened that night."  Nor can the court find case authority for the provisions that trial judges who express opinions of guilt pretrial may do so as long as they are not later the primary triers of fact.  (The Franklin case was tried to a jury, see 239 Wis.2d 594, 2000 WL 1506965).  Finally, petitioner does not urge that the trial judge exhibited any actual bias at trial,

---

[5]  It could well also be the case that a defense attorney might wish the criminal case settlement judge to "take the wood" to a stubborn client who is acting adverse to his best interests.

1   and the undersigned, like the Court of Appeal, has found none.  However, either the expression of

2   prejudged guilt by the trial judge is structural error, not subject to harmless error analysis (i.e.,

3   regardless of the evidence pointing to guilt), or it is not.  The applicable law indicates that it is,

4   and the undersigned must follow the law.  The Court of Appeal's decision was AEDPA

5   unreasonable, and the petition should be granted as to Claim 2.[6]

6          The undersigned takes no pleasure in observing that if this finding is accepted on

7   further review, a retrial will occasion logistical and witness hardships.  The victim's family will

8   again, unfortunately, have their loss renewed and emphasized.  The human and monetary costs

9   involved with retrial are especially unfortunate in that it does not appear that petitioner was

10  prejudiced before the jury by the trial judge's pre-trial comments.  The evidence against petitioner

11  was overwhelming.  However, structural errors, e.g., Batson errors, lack of counsel, judicial bias,[7]

12  do not deal with the guilt or innocence of the defendant—they deal with the basic fairness of

13  criminal proceedings.  It has been long ago decided that the hardships entailed with reversal of a

14  criminal proceeding for structural error are worth the systemic benefits.  Vasquez v. Hillery, 474

15  U.S. 254,262, 106 S. Ct. 617, 623 (1986).

16          5.  *Petitioner's Jury Instruction Argument Is a Matter of State Law*

17          Petitioner argues that the omission of the "carry out and advance" language of

18  CALJIC 8.81.17 invalidates the special circumstance finding of the jury in ths case.  He believes

19  that an Apprendi violation (failure to have a jury find all the elements of a crime beyond a

20  reasonable doubt)[8] has therefore occurred.  There is no need to detail all the circumstances of

21  

22          [6] Can any one doubt that had petitioner pled guilty after this plea conference that the trial
    judge's telling petitioner in the strongest terms that he did not have a chance, and that he would

23  be "stupid" for going to trial, such pressure by the trial judge would have rendered the plea
    involuntary?

24          [7] Vasquez v. Hillery, 474 U.S. 254, 263, 106 S. Ct. 617, 623 (1986); Franklin, supra;

25  Maurino v. Johnson, 210 F.3d 638, 644 (6th Cir 2000) abrogated on other procedural grounds by
    Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000).

26          [8] Apprendi v. United States, 530 U.S. 466, 120 S. Ct. 2348 (2000).

23

1   petitioner's claim because there are two simple, dispositive answers to it.

2         First, even if <u>Apprendi</u> could be viewed as having displaced all authority which

3   actually involves the issue of partial omission of a jury instruction (and <u>Apprendi</u> has not), the

4   issue here revolves about the decision of the state appellate court that as a matter of state law, the

5   instruction desired by petitioner did not have to be given.  Absent a patently arbitrary

6   interpretation of state law designed to avoid a federal issue, state courts are the final arbiters of

7   state law.  <u>Bonin v. Calderon</u>, 59 F.3d 815, 841 (9th Cir. 1995).  In this case, the state appellate

8   court found that under the authority of <u>Peole v. York</u>, 11 Cal. App.4th 1506, 15 Cal. Rptr. 2d 66

9   (1992), the instruction desired by petitioner did not have to be given.  Appellate opinion at 30-32.

10   That is the end of the matter.

11         Moreover, it has been conclusively held that <u>Apprendi</u> is not to be retroactively

12   applied to habeas cases on collateral review.  <u>Cooper-Smith v. Palmeteer</u>, 397 F.3d 1236, 1246

13   (9th Cir. 2005).  This claim should be denied.

14   *Conclusion*

15         The undersigned recommends that Claims 1 and 3 of the petition be denied.

16   Although regretting the costs to the victim's family, the disturbance of witnesses, and the cost of

17   retrial, the undersigned must nevertheless reluctantly recommend a grant of the petition as to

18   Claim 2.

19   DATED: 4/19/05

20                   /s/ Gregory G. Hollows

21                   GREGORY G. HOLLOWS
                UNITED STATES MAGISTRATE JUDGE

22   crat1893.157

23

24

25

26